**BRADFORD DYEING ASSOCIATION, INC.**

v.

**J. STOG TECH GMBH.**

**No. 99–440–Appeal.**

Supreme Court of Rhode Island.

Feb. 14, 2001.

Gerald John Petros, Alexandra K. Callam, Providence, for Plaintiff.

James E. Purcell, Melissa E. Darigan, Providence, for Defendant.

Present: WEISBERGER, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

BOURCIER, Justice.

In these cross-appeals we are called upon to determine whether a Superior Court trial justice erred in vacating an arbitrator's award concerning a contract dispute between the parties to this case.

For the reasons we hereinafter set out, we conclude that he did, and we vacate his decision and the final judgment that was entered thereon.

### I

### Facts and Case Travel

Bradford Dyeing Association, Inc. (Bradford) operates a textile manufacturing plant in the town of Westerly. Part of its manufacturing function involves the dyeing and finishing of woven cloth fabrics, requiring daily utilization of thousands of gallons of water. The wastewater resulting from that manufacturing has been for years funneled into a lagoon with a capacity of 10 million gallons near Bradford's manufacturing plant. Before 1994, the wastewater in the lagoon had been biologically treated by means of an aeration process employed by Bradford. That process, however, had not been looked upon with much favor by the Rhode Island Department of Environmental Management (DEM) because the sludge residue it generated was permitted to accumulate in the lagoon. During the spring thawing of each year, Bradford would open its floodgates, permitting some of that sludge to wash out into the nearby Pawcatuck River, causing serious environmental concerns. Beginning as far back as the mid 1980's, DEM

had been pressing Bradford to change and improve its wastewater treatment program to alleviate the continuing sludge problem in the lagoon.

In the early 1990's, Timothy Badger (Badger), a principal and sales representative for a recently formed Massachusetts corporation called Aqualife N.A., contacted Richard Grills (Grills), who at that time was Bradford's president and chief executive officer. Badger's corporation had been licensed to market a wastewater treatment system in the United States that had been developed by the defendant J. Stog Tech GmbH (Stog), in Germany, and which has been successfully used there as well as in other European countries and in Africa. That system, known as Aqualife, incorporated two generally accepted methods for treating wastewater, known as fixed film media and suspended solids, and treated wastewater aerobically by introducing oxygen directly to the biological components of the wastewater. Through Badger's marketing effort he was able to interest Grills in the virtues and advantages of the Aqualife System.

Grills, although obviously impressed by Badger's marketing ability and the successful track record of the Aqualife System, refused, however, to sign a contract to buy the Aqualife System from Aqualife N.A. because he deemed it to be merely a start-up Massachusetts corporation. Instead, he insisted upon only dealing directly with Stog. Additionally, Grills insisted upon obtaining from Jochen Stog, Stog's principal owner, not only a personal guarantee for the successful functioning of the Stog Aqualife System but also a performance insurance policy from Lloyd's of London before he would agree on behalf of Bradford to purchase the Aqualife System.

Despite Grills's hard bargaining demands, Bradford and Stog did, on September 6, 1991, enter into an initial purchase agreement for the Stog Aqualife System. The agreement required Stog to provide Bradford with a "fully installed and operational" Aqualife System on or before January 6, 1992, and required Bradford to pay Stog an initial part payment of $375,000. The total purchase price for the system was $1,050,000. Stog had four months within which to design and build the waste treatment system.

Stog, obliging both Grills's and Bradford's strict timetable for the manufacture, delivery, and installation of the Aqualife System, immediately contracted for the fabrication and purchase of the regenerators [1] and other components necessary to manufacture the Aqualife System and to make it ready for timely installation at Bradford's plant in Westerly. By early December 1991, some one month earlier than Bradford's deadline for delivery, Stog had completed the Aqualife System and was then ready, willing and able to install it at Bradford's plant.[2]

Notwithstanding Stog's prompt compliance with its obligation under the September 6, 1991 purchase agreement, Bradford was still battling with DEM over what Bradford was required to do with regard to ridding its lagoon of the accumulated sludge. Preoccupied with its sludge removal problems, Bradford delayed submitting its application with DEM for an order of approval for installing Stog's Aqualife system until November 26, 1991. Bradford also refused to permit installation of Stog's system until its continuing dispute with DEM over the removal of the sludge had been resolved. Bradford's battling with DEM carried on throughout 1992.

---

1. "Regenerators" is the name given to the primary component of the Aqualife System. They are metal framed structures, some forty feet long, through which the wastewater facility's wastewater is funneled. Fixed film media within the regenerator provide a base for the growth of microbiological agents that are necessary for the aerobic treatment of wastewater.

2. Stog had completed all that was required, except for installation at Bradford's plant, the cost of which was estimated at $60,000.

On January 4, 1993, Bradford and DEM were finally able to resolve their long-standing dispute concerning Bradford's sludge problem and to prepare to have Stog's wastewater treatment system installed at Bradford's plant. Pursuant to a consent agreement entered into on that date between Bradford and DEM, Bradford agreed to remove the sludge from its lagoon by May 1, 1993. DEM in turn agreed to issue an order of approval for the installation of Stog's Aqualife System as a demonstration project at Bradford's plant site after Bradford removed the sludge from its lagoon. Bradford additionally agreed to engage a Rhode Island professional engineer to prepare and submit to DEM a plan for monitoring Bradford's wastewater treatment and also to conduct a performance evaluation of the Stog Aqualife System. Bradford to that end hired Ash Design Group, Inc., a local professional engineering firm, to prepare the required monitoring and evaluation reports for submission to DEM. An evaluation report concerning the Aqualife System was submitted to DEM on February 3, 1993, and was approved by DEM on March 5, 1993. At that point in time, Bradford's only remaining obligation to DEM under the January 4, 1993 consent agreement was to remove the sludge from its lagoon.

Confident that the sludge removal would be timely accomplished, Bradford on April 15, 1993, entered into an "Amended and Restated Purchase Agreement" with Stog for its Aqualife wastewater treatment system. In that agreement, Bradford again agreed to purchase and pay Stog $1,050,000 for the Aqualife System. The amended purchase agreement also incorporated as part of its terms Bradford's January 4, 1993 consent agreement with DEM, including Bradford's obligation to finish removing the sludge from its lagoon before DEM would issue an order of approval to install Stog's Aqualife System. The April 15, 1993 Amended and Restated Purchase Agreement by its terms was not, however, expressly made conditional upon Bradford's prior removal of the sludge from its lagoon or upon the prior issuance of a DEM order of approval to install Stog's wastewater treatment system. Stog's obligation under the amended purchase agreement, as written, was essentially to deliver a Stog Aqualife wastewater treatment system that would reduce various organic constituents in Bradford's wastewater to levels commensurate with the agreement's required standards. Importantly, the Amended and Restated Purchase Agreement permitted Bradford to terminate the agreement only for specific reasons: failure of Stog to perform its obligations under the contract or failure to substantially initiate services; Stog's bankruptcy or receivership; any assignment by Stog for the benefit of creditors; and Stog's failure to make progress so as to give Bradford reason to anticipate Stog's failure of performance. The termination clause in the agreement further required Bradford to notify Stog in writing about any alleged failure to perform and gave Stog forty-five days thereafter during which to cure the alleged failure.

The Amended and Restated Purchase Agreement also contained a mandatory arbitration clause requiring the parties to submit to arbitration any claim or dispute arising out of the contract. That clause notably provided for an expanded scope of judicial review of any arbitration award. It provided that: "The arbitrators shall state reasons for their award, listing findings of fact and conclusions of law. Either party may appeal to a court of competent jurisdiction any conclusion of law in the decision, *provided, however,* the findings of fact by the arbitrators shall be absolute."

Pursuant to its obligation imposed by the incorporated January 4, 1993 DEM consent agreement, Bradford elected to hire a private corporation, Environmental Waste Technology, Inc. (EWT), to remove the sludge from the lagoon, but EWT failed to remove the sludge to DEM's satisfaction by May 1, 1993. Stog, in the

meantime, was waiting for Bradford's permission to deliver and install the Aqualife System that already had been manufactured and prepared for Bradford.

In September 1993, still without an order of approval in hand, Bradford, without notice to Stog, engaged a consulting engineer, Edwin Barnhart (Barnhart), and his Hydroscience company to provide assistance with its continuing, tardy, and unsuccessful lagoon sludge dredging project. Barnhart, for what appears to be his own self-interest, devoted most of his efforts not with the sludge removal project, but instead with criticizing the efficiency of the proposed Stog Aqualife System, which could not be installed until Bradford first removed the sludge from its lagoon and DEM issued its order of approval. After essentially bushwhacking Stog's wastewater treatment system, Barnhart then conveniently convinced Grills to consider a water treatment system that his company had designed, and followed that by submitting a request with DEM to modify Bradford's January 4, 1993 consent agreement with DEM to permit the Barnhart system to be substituted in place of Stog's Aqualife System. In addition, Grills authorized Barnhart to amend Bradford's pending application for the DEM order of approval to permit installation of Barnhart's system. Stog was not informed by Grills concerning Barnhart's conclusions about his evaluation of the Stog Aqualife System nor of the fact that Bradford's pending application with DEM for the order of approval was to be amended.

On July 13, 1994, Bradford, relying upon Barnhart's negative evaluation conclusions concerning the efficiency of Stog's Aqualife System, sent a notice terminating the April 15, 1993 Amended and Restated Purchase Agreement for the Aqualife System to Stog. The notice, as later determined by the arbitrator, failed to comply with the

prescribed and limited manner for terminating the contract that had been expressly set out in section 6 of the amended agreement. Bradford's notice of termination specified as the sole basis for Bradford's termination that:

"Barnhart's evaluation of the likely performance of the Aqua life [*sic* ] equipment raises serious concerns about Stog's ability to meet the system performance warranty requirements of Section 5.6 of the Amended and Restated Purchase Agreement."

No other reason was given by Bradford to justify its unilateral termination of the amended purchase agreement.

Subsequently on May 1, 1996, Stog, pursuant to the April 15, 1993 Amended and Restated Purchase Agreement, initiated the underlying arbitration proceedings, alleging that Bradford had without valid reason breached its contractual commitment to purchase and pay for the Aqualife System, and demanding damages resulting from that breach from Bradford. Bradford responded by filing a counterclaim seeking from Stog the return of its $375,000 initial purchase deposit paid to Stog, together with associated damages, plus interest.

Following extended arbitration hearings conducted before a single arbitrator,[3] the arbitrator on June 29, 1998, rendered a comprehensive and detailed arbitration decision. In that decision he concluded that Bradford, on or about September 1, 1993, had without just or valid reason unilaterally terminated and breached its April 15, 1993 Amended and Restated Purchase Agreement with Stog by abandoning that agreement and deciding to purchase Barnhart's system. He found that Bradford had presented "no evidence on the record to demonstrate that Stog failed to perform any of Stog's obligations under the Amended Purchase Agreement, or that

**3.** Martin Weiss, a highly qualified and regarded engineer whose professional field of specialization was wastewater treatment engineering projects, had been agreed upon and

selected by both Bradford and Stog to arbitrate their contract dispute in accord with the procedural rules of the American Arbitration Association.

Stog failed to substantially initiate the Services under the Amended Purchase Agreement."

The arbitrator accordingly found that Stog was entitled to damages resulting from Bradford's breach amounting to $585,000.[4] He further ordered Bradford to pay interest at the rate of 12 percent on the $585,000 damages award from September 1, 1993, the date he determined that Bradford had terminated and breached the agreement, and all arbitration costs and expenses, including reasonable attorney fees. The arbitrator did, however, deny Stog's requested damages for its expenses relating to a claim made against Stog by Scanzillo Corporation (Scanzillo) that had, after fabricating the generators needed for Stog's Aqualife System, stored the generators awaiting delivery to Bradford's plant in Westerly. The arbitrator found that Stog was entitled to damages only to compensate it for storage charges due Scanzillo by Stog from September 1993, the date of Bradford's breach of the amended purchase agreement, until June 1998, totaling $84,551. The arbitrator then calculated each of his specific findings of damages due Stog as a result of Bradford's breach of the April 15, 1993 amended purchase agreement and awarded Stog a total of $1,008,851 for its damages.[5] He then found "as a factual matter that Bradford has failed to prove its Counterclaim" and denied and dismissed Bradford's counterclaim.

On August 25, 1998, Bradford filed a civil action complaint in the Superior Court seeking to vacate or modify the arbitrator's award pursuant to G.L.1956 §§ 10–3–12 and 10–3–14, respectively, and thereafter on September 2, 1998, Stog filed its motion to confirm the award pursuant to § 10–3–11.[6] After hearings in the Superior Court, a trial justice concluded that the parties were at all times aware that before Stog's Aqualife System could be installed in Bradford's lagoon, DEM had to issue an order of approval for its installation. He deemed that both Bradford and Stog intended the issuance of that order of approval to be a condition precedent for delivery and installation of the Stog Aqualife System and, because DEM had never issued the order, that excused Bradford's performance under the contract and its obligation to pay Stog for the Aqualife System. The trial justice concluded that the arbitrator had erroneously equated Bradford's contractual obligations under the April 15, 1993 Amended and Restated Purchase Agreement to obtain the DEM order of approval, with the blame for DEM's failure to issue the order. He presumably concluded that Bradford was without fault for DEM's failure to issue the order of approval and, because the issuance of that order was a condition precedent to Bradford's performance, "the law excuses Bradford from performance." He then, after having concluded that Bradford had not breached its contract with

4. He determined that net amount by first deducting from the $1,050,000 contract purchase price the $375,000 initial Bradford down payment, the "$60,000 (B–87) amount saved as a result of the fact that Stog did not have to actually install the Aqualife System in the Bradford lagoon, and the $30,000 amount saved as a result of the fact that Stog did not have to perform acceptance testing for six months and make any required adjustments to the system (estimated cost 20% of $150,000 hold back payment)."

5. The arbitrator, pursuant to the parties' agreement to arbitrate, also ordered Bradford to pay Stog the administrative fees and expenses of the American Arbitration Associa-

tion and, in a supplemental award, directed Bradford to pay Stog's attorneys fees totaling $162,000.

6. General Laws 1956 § 10–3–11 provides:

"At any time within one year after the award is made, any party to the arbitration may apply to the court for an order confirming the award, and thereupon the court must grant the order confirming the award unless the award is vacated, modified or corrected, as prescribed in §§ 10–3–12—10–3–14. Notice in writing of the application shall be served upon the adverse party or his or her attorney ten (10) days before the hearing on the application."

Stog, did, notwithstanding, permit Stog to retain the $375,000 deposit paid by Bradford to Stog as the initial payment toward the purchase of Stog's Aqualife System, reasoning that Stog had acted in good faith reliance upon the completion of the contract between the parties.

The trial justice then entered a final judgment in favor of Bradford and vacated the arbitrator's award. Stog appeals from the vacating of the award and Bradford appeals from the trial justice's ruling permitting Stog to retain the $375,000 initial purchase deposit it paid to Stog.

## II

### Standard of Review

■ In a Superior Court proceeding seeking to vacate or modify an arbitrator's award pursuant to § 10–3–12, a hearing justice conducts a prescribed, limited review.[7] *Aetna Casualty & Surety Co. v. Grabbert*, 590 A.2d 88, 92 (R.I.1991). Er-

ror of law on the part of the arbitrator affords no ground for relief. *Loretta Realty Corp. v. Massachusetts Bonding and Insurance Co.*, 83 R.I. 221, 225, 114 A.2d 846, 848 (1955).[8]

In *Westminster Construction Corp. v. PPG Industries, Inc.*, 119 R.I. 205, 210, 376 A.2d 708, 711 (1977), we noted there that while a mistake of law is not a ground for disturbing an award, we cited to federal case law that permitted "manifest disregard of the law" by an arbitrator to serve as a basis for disturbing the award.[9] Yet, we later noted in *Grabbert*, 590 A.2d at 92, that "We have consistently maintained that an award may be vacated only if it is 'irrational' or 'manifestly disregards the applicable contract provisions' * * * or if it falls within one of the four statutorily prescribed grounds in § 10–3–12." *See also Loretta Realty Corp.*, 83 R.I. at 225, 114 A.2d at 848.

For purposes of the appeals now before us we need not however concern ourselves

---

7. Section 10–3–12, "Grounds for vacating award," states:

 "In any of the following cases, the court must make an order vacating the award upon the application of any party to the arbitration:
 (1) Where the award was procured by corruption, fraud or undue means.
 (2) Where there was evident partiality or corruption on the part of the arbitrators, or either of them.
 (3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in hearing legally immaterial evidence, or refusing to hear evidence pertinent and material to the controversy, or of any other misbehavior by which the rights of any party have been substantially prejudiced.
 (4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."

8. Prior to the enactment of P.L.1929, ch. 1408 (the Arbitration Act) arbitration in this state was pursuant to the common law. *Harris v. Social Manufacturing Co.*, 8 R.I. 133, 139 (1864). At common law an arbitration award could be vacated when a "mistake in the law appears on the face of the award." *Id.*

In 1929 the General Assembly, when enacting and adopting our presently existing statutory form of arbitration, specifically omitted to incorporate error of law into its new statutory arbitration scheme as a ground for the vacating and setting aside of an arbitrator's decision. The 1929 legislation that is now chapter 3 of title 10 of our general laws sets out in § 10–3–12 and § 10–3–13 the four prescribed statutory grounds upon which an award may be vacated or modified. "The fact that they [the Legislature] * * * omitted any reference to mistake of law appearing on the face of the award * * * is, in our opinion, convincing evidence that they did not intend that an award under the statute should be open to question on that ground." *Loretta Realty Corp. v. Massachusetts Bonding and Insurance Co.*, 83 R.I. 221, 226, 114 A.2d 846, 849 (1955).

9. We explained in that case that, " '[M]anifest disregard of the law must be something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law. * * * [A] manifest disregard of the law * * * might be present when arbitrators understand and correctly state the law, but proceed to disregard the same.' " *Westminster Construction Corp. v. PPG Industries, Inc.*, 119 R.I. 205, 211, 376 A.2d 708, 711 (1977).

with whether the alleged errors of law on the part of the arbitrator in this case were of ordinary or manifest nature. The parties in their April 15, 1993 Amended and Restated Purchase Agreement had agreed to submit any dispute that might arise out of that agreement to arbitration, and in Section 12 therein provided that:

"Either party may appeal to a court of competent jurisdiction any conclusion of law in the [arbitrator's] decision, *provided however*, the findings of fact by the arbitrator shall be absolute."

In a statutory arbitration proceeding such as that now before us, as distinguished from a common law arbitration proceeding, whether the parties may, by their private agreement, enlarge the scope of judicial review that is permitted by § 10–3–12 has not been questioned by the parties. Several federal courts, we note, have approved private agreements to do so under the Federal Arbitration Act. *See Lapine Technology Corp. v. Kyocera Corp.*, 130 F.3d 884, 887 (9th Cir.1997); *Syncor International Corp. v. McLeland*, 120 F.3d 262 (table), No. 96–2261, 1997 WL 452245 at * 6 (4th Cir.W.Va. Aug. 11, 1997); *Gateway Technologies, Inc. v. MCI Telecommunications Corp.*, 64 F.3d 993, 995 (5th Cir.1995). Not all federal courts have, however, adopted this viewpoint. In *UHC Management Co. v. Computer Sciences Corp.*, 148 F.3d 992, 998 (8th Cir. 1998), the Eighth Circuit refused to enforce a contractual provision purporting to expand judicial review.[10]

This Court, however, has not as yet had occasion to consider whether under our statutory arbitration scheme such enlargement is permitted. Notwithstanding the observation we make concerning the ability of the parties by their private agreement to enlarge the scope of appellate judicial review prescribed in § 10–3–12, we will for purposes of this case assume they may, without deciding the validity of their agreement.[11] We will further assume that their agreement contemplated that this Court would also review any errors of law alleged to have been made by a trial justice in a decision to vacate or confirm an arbitrator's award.[12]

### III

### Analysis

Stog, in this appeal, asserts that the trial justice erred in construing the April 15, 1993 amended purchase agreement as intending that the issuance by DEM of the order of approval for installing Stog's Aqualife system at Bradford's plant was an implied condition precedent to Bradford's contractual obligation to pay Stog the contract purchase price for the system.

Bradford contends otherwise. It asserts that the trial justice correctly interpreted the amended purchase agreement as being conditioned upon issuance of the DEM order of approval, and that because the order was not issued, Bradford was relieved of its contractual obligation to pay Stog

---

**10.** The Federal Arbitration Act provides in part that an arbitration award shall not be vacated unless: (1) the award was procured by corruption, fraud, or undue means; (2) there is evidence of partiality or corruption among the arbitrators; (3) the arbitrators were guilty of misconduct which prejudiced the rights of one of the parties; or (4) the arbitrators exceeded their power. 9 U.S.C. § 10(a).

**11.** We leave for another day and case whether parties may by private agreement enlarge the scope of the prescribed limitations set out in § 10–3–12, at which time the question can be fully briefed and argued.

**12.** Our appellate scope of review is prescribed in § 10–3–19. Section 10–3–19 provides:

"Any party aggrieved by any ruling or order made in any court proceeding as authorized in this chapter may obtain review as in any civil action, and upon the entry of any final order provided in § 10–3–3, or an order confirming, modifying or vacating an award, he or she may appeal to the supreme court as provided for appeals in civil actions, and the supreme court shall make such orders in the premises as the rights of the parties and the ends of justice require."

the purchase price called for in the agreement.

In this appeal, the existence and validity of the April 15, 1993 Amended and Restated Purchase is not in issue. What is in issue is the trial justice's interpretation of that agreement. The arbitrator had in paragraph 10 of his findings found that:

"Nowhere in the Amended Purchase Agreement is there any condition precedent that an Order of Approval be obtained from RIDEM to install the Aqualife System prior to Bradford being obligated to pay the purchase price to Stog. It would have been rather simple for the drafter of the Agreement to state expressly that Bradford would be under no obligation to pay the purchase price to Stog unless and until an Order of Approval to install the Aqualife System had been obtained from RIDEM. No such condition precedent exists in the Amended Purchase Agreement."

The trial justice later, when considering the parties' motions to vacate and to confirm the arbitrator's award, agreed that "the agreement does not expressly make DEM approval a condition of Bradford's obligation to pay for the system," but that the agreement did not have to do so. He reasoned that the January 4, 1993 consent agreement between Bradford and DEM that had been incorporated into the amended purchase agreement between Bradford and Stog "fully" implicated "DEM's approval at every step of the Aqualife Treatment System as described to DEM in the November 26, 1991 original application by Bradford for approval of the system."

Accordingly, he concluded that the issuance of that DEM order of approval was an "express condition precedent" to Bradford's performance of the contract, and the fact that the order was not issued "excuses Bradford from performance," citing in support of his conclusion, Restatement (Second) Contracts, §§ 225 and 261 (1981).

■ The dispositive question that we must resolve in this appeal is whether the trial justice erred in concluding as a matter of law that the issuance of the DEM order of approval was indeed an implied condition precedent to Bradford's obligation to pay Stog for its Aqualife System, and whether the lack of such an order excused Bradford's obligation.[13]

Our review of the record before us indicates clearly that pursuant to the April 15, 1993 amended and restated purchase agreement, Stog was required to construct, deliver, and install its Aqualife wastewater treatment system in Bradford's lagoon in Westerly. In return, Bradford was to pay Stog $1,050,000 for that system. Also made part of the April 15, 1993 Bradford–Stog agreement, by express incorporation, was Bradford's January 4, 1993 consent agreement with DEM concerning the required removal by Bradford of the large amount of sludge it had permitted to accumulate in the lagoon. That consent agreement obligated Bradford to remove the sludge by May 1, 1993, and obligated DEM to issue its order of approval upon Bradford's timely removal of the sludge.

Thus, as we look at the two merged agreements, the January 4, 1993 consent agreement between Bradford and DEM, and the April 15, 1993 agreement between Bradford and Stog, we conclude therefrom that as of April 15, 1993, the respective and reciprocal obligations of Bradford, DEM and Stog had been fixed. First, Bradford was required to remove the accumulated sludge from its lagoon by May 1, 1993. Second, DEM, upon Bradford's timely removal of the sludge, was to issue its order of approval for the installation of Stog's Aqualife System. Third, Stog, upon issuance of the order of approval, was to

---

**13.** The trial justice described the condition at one point in his decision as an express condition and at another, as an implied condition. Regardless of that confusion, the result, excusing Bradford's performance, is the same.

deliver and install its Aqualife System to Bradford at its Westerly plant.

■ We conclude from the trial justice's decision, entered following the hearings held on Bradford's motion to vacate or modify the arbitrator's award and on Stog's motion to confirm the award, that the trial justice correctly interpreted the combination of the January 4 and April 15 agreements to have created an implied condition precedent to Bradford's performance required by the April 15 amended purchase agreement. If that had been all that the trial justice was required to consider, namely, whether issuance of the DEM order of approval constituted an implied condition precedent to Bradford's performance of its contractual obligations to Stog, we would conclude our consideration of the cross-appeals now before us and affirm the trial justice's decision and the judgments entered thereon. We agree that the issuance of the DEM order of approval was indeed an implied condition precedent in the April 15, 1993 amended purchase agreement. However, we do not agree with the trial justice's conclusion that merely because the order was not issued Bradford automatically was excused from its obligations to Stog, ending the necessity of any further consideration of Stog's motion to confirm the arbitrator's award.

■ At the arbitration hearings, Bradford conceded that it was its obligation to apply for and to obtain the DEM order of approval to install the Stog Aqualife wastewater treatment system. That obligation imposed upon Bradford its implied promise to Stog that Bradford would in good faith take all reasonable steps and make all reasonable effort to obtain the DEM order of approval. *See A.A.A. Pool Service & Supply, Inc. v. Aetna Casualty &*

*Surety Co.*, 121 R.I. 96, 98, 395 A.2d 724, 725 (1978); *Ide Farm & Stable, Inc. v. Cardi*, 110 R.I. 735, 739, 297 A.2d 643, 645 (1972); *Psaty & Fuhrman, Inc. v. Housing Authority*, 76 R.I. 87, 93, 68 A.2d 32, 36 (1949); 2 *Farnsworth on Contracts*, § 8.6 (2nd ed.1998). The trial justice appears to have only half recognized Bradford's role in that regard when noting that "[t]he legal issue in this case is not who was responsible for obtaining the approval, as perceived by the arbitrator, but rather who was responsible for the failure of DEM to issue its approval." He then added to that recognition that the arbitrator had "erroneously equated" Bradford's responsibility "with blame." We conclude that it was the trial justice who erred in failing to recognize in light of the arbitrator's findings of fact, which were made absolute and binding on the parties, that it was Bradford's conceded "responsibility" to obtain the DEM order of approval to install Stog's Aqualife System, and that Bradford was to "blame" for its not being issued.[14]

Bradford, it must be emphasized, had in its January 4, 1993 consent agreement with DEM obligated itself to remove the accumulated sludge from its lagoon, and DEM in return had agreed to issue the order of approval when that had been done. So what happened?

The evidence before the arbitrator clearly revealed that Bradford at all times in its dealings with DEM simply neglected and ignored its obligations to DEM, and did so without any regard to the environmental concerns of DEM. In fact, DEM actually reproached Bradford's attorneys for Bradford's inept performance of its obligations to have removed the sludge from its lagoon by May 1, 1993. Had the sludge removal

14. Bradford, by its authorization on April 14, 1994, to Barnhart to amend its pending application and request with DEM that had sought the order of approval for the installation of Stog's system and for the modification of its January 4, 1993 consent agreement with DEM to also substitute Barnhart's system in place of Stog's, effectively served to jettison any possibility that an order of approval for installing Stog's system could ever materialize. The April 18, 1994 letter from Barnhart to DEM authorizing those substitutions had been introduced as an exhibit at the arbitration hearing.

plan submitted by Ash Design Group, on behalf of Bradford and approved by DEM, on March 5, 1993, been thereafter carried out by Bradford, DEM would have issued its order of approval for the installation of Stog's Aqualife wastewater treatment system.[15]

Furthermore, in September 1993, long past the DEM deadline for removing the lagoon sludge, Bradford decided upon bringing Barnhart into its sludge removal project. Barnhart unfortunately appears to have been more interested in ambushing Stog's Aqualife wastewater treatment system than in getting the sludge removed from Bradford's lagoon. Barnhart actually undertook an evaluation of the Stog system, and advised Grills, Bradford's president, that it was entirely inadequate and faulty. He then persuaded Grills and Bradford to get rid of the Stog system and substitute in its place a system that Barnhart's Hydroscience firm was touting. Concerned that Stog's Aqualife System would not measure up to its expected performance, Grills fired off a letter to Stog on July 13, 1994, terminating the April 15, 1993 Amended and Restated Purchase Agreement. He cited Barnhart's evaluation of the Aqualife System as the sole reason for his doing so. He asserted that it raised "serious concerns about Stog's ability to meet the system performance warranty requirements in Section 5.6" of the 1993 amended agreement. Grills, when later testifying at the arbitration hearing, admitted that the sole basis for his sending the notice of termination to Stog was Barnhart's opinion. The evaluation letter from Barnhart was introduced at the hearing as an exhibit.

The arbitrator, a highly qualified wastewater engineer, considered and evaluated the validity of Bradford's July 13, 1994 termination letter and Barnhart's criticism of Stog's Aqualife system. The arbitrator found Barnhart's evaluations to be grossly faulted. He found for example that:

"31. The opinion by Mr. Barnhart in PX–138 that the Aqualife System, if it were allowed to be installed, would not meet the system performance warranties under the Amended Purchase Agreement was flawed by his own computations.

"32. It is quite clear that the computation in PX–138 by Mr. Barnhart was erroneous. Even Mr. Barnhart admitted that his computation in PX–138 of the oxygen supply was understated * * * [and] admitted that his COD figure was overstated by 50% (30,000 pounds of COD v. 20,000 pounds of COD). Likewise, there were other errors made in his calculation, and his calculation, is further refuted by Hydroscience's preliminary engineering report marked PX–133, and Mr. Barnhart's own April 18, 1994 letter to RI-DEM marked PX–137.

"33. Likewise, Mr. Barnhart's concerns expressed in PX–138 concerning mixing were seriously flawed. Mr. Barnhart exhibited a fundamental misunderstanding of the methodology of the Aqualife System, which is understandable since he had not even seen one when he issued his opinion. Mr. Barnhart had no idea how the generator units were to be set up, that the Bradford lagoon was to be walled off into separate cells, that there would be a recycling of the biomass and suspended solids by the pumps, and that more than the pumped volume of wastewater per day could be flowing through each regenerator unit. It is obvious that the mixing was substantially greater than that envisioned by Mr. Barnhart in PX–138. Accordingly, the sole basis upon which Bradford relied to terminate the Agreement, PX–138, was inaccurate, incorrect, and fundamentally flawed. PX–174 demon-

---

**15.** Whether that order of approval was to allow Stog to install its system as a "demonstration project" or otherwise is of no material consequence in view of the fact that Bradford's complete failure to comply with its January 4, 1993 consent agreement with DEM effectively made the issuance of any order impossible.

strates many of the errors and issues in Mr. Barnhart's PX–138 calculations.

"34. * * * Bradford contends that the true issue is whether, in fact, the Aqualife System would have met the system performance warranties of the Amended Purchase Agreement had it been installed.

"35. In any event, I find as a matter of fact, that Mr. Barnhart did not demonstrate in either his prior reports or his testimony at the hearing that Aqualife System would not have met the system performance warranties in the Amended Purchase Agreement. While there were numerous errors in his opinion, most important were the following:

a. Mr. Barnhart's calculation assumed an incorrect pond volume of 12 million gallons, rather than 10 million gallons.

b. Mr. Barnhart made an assumption of oxygen transfer of 1.55 pounds of oxygen per horse power—something clearly inadequate.

c. Mr. Barnhart's assumption was that the only water that would pass through a regenerator unit would be the water that passed through the pump. More than the pumped volume of water would pass through a regenerator each day because the regenerator units themselves act as venturis.

d. Mr. Barnhart incorrectly calculated the volume of the regenerator unit, thereby underestimating the amount of biomass in the Aqualife System.

e. Mr. Barnhart in his testimony grossly underestimated the amount of time of contact of the oxygen with the water.

" * * *

"37. I find that Bradford breached the Amended Purchase Agreement on or about September 1, 1993. By this time, it was clear that Bradford was not going to adequately address the sludge removal issue under the Consent Agreement to satisfy DEM."

While we agree with the trial justice that Bradford's obtaining of an order of approval for installing Stog's Aqualife wastewater treatment system was a condition precedent to its obligation to accept and pay for that system, we fault the trial justice's failure to recognize the clear "absolute" findings of fact made by the arbitrator concerning Bradford's total neglect and breach of its commitment to DEM pursuant to the January 4, 1993 consent agreement to remove the sludge from its lagoon by May 1, 1993. It was clearly Bradford's contractual duty to do so, it failed to do so, and it had assumed the risk of its own inability to perform its duty. Restatement (Second) *Contracts* § 261, cmt. *e* (1981); *see also Craig Coal Mining Co. v. Romani*, 355 Pa.Super. 296, 513 A.2d 437, 439 (1986). Stog should not now be penalized because of Bradford's breach of the consent agreement that Bradford had entered into with DEM, and because of which, the DEM order of approval had not been granted.

 It is both elementary as well as fundamental law that where parties contract and make performance conditional upon the happening of an occurrence of a particular matter, the contract imposes upon the party required to bring about the happening of that occurrence an implied promise to use good faith, diligence and best efforts to bring about that happening. *United States v. Croft–Mullins Electric Co.*, 333 F.2d 772, 775 n. 4 (5th Cir.1964) (quoting *Gulf, Mobile & Ohio Railroad Co. v. Illinois Central Railroad Co.*, 128 F.Supp. 311, 324 (N.D.Ala.1954), and stating:

"'A contracting party impliedly obligates himself to cooperate in the performance of his contact and the law will not permit him to take advantage of an obstacle to performance which he has created or which lies within his power to remove'").

 It is further both elementary as well as fundamental contract law that if

one party to the contract prevents the happening or performance of a condition precedent that is part of the contract, that action eliminates the condition precedent. A party "cannot escape liability by preventing the happening of the condition on which it was promised." 8 *Corbin on Contracts,* § 40.17 at 580–81 (Perillo rev. ed.1999); 2 *Farnsworth on Contracts* § 8.6 (2nd ed.1998); 5 *Williston on Contracts* § 677 at 225 (1961); *see also St. Louis Dressed Beef and Provision Co. v. Maryland Casualty Co.,* 201 U.S. 173, 181, 26 S.Ct. 400, 403, 50 L.Ed. 712, 716 (1906) (Holmes, J.) ("it makes no practical difference * * * whether we say that the defendant by its conduct made performance of the conditions by the plaintiff impossible, and therefore was chargeable for the sum which it would have had to pay if those conditions had been performed, or answer * * * that performance of the conditions was waived"); *Harold Wright Co. v. E.I. DuPont de Nemours & Co.,* 49 F.3d 308, 309 (7th Cir.1995); *Vanadium Corp. v. Fidelity & Deposit Co.,* 159 F.2d 105, 108 (2nd Cir.1947); *Alix v. Alix,* 497 A.2d 18, 21 (R.I.1985); *Tarbell v. Bomes,* 48 R.I. 86, 90, 135 A. 604, 605 (1927); *Martin v. Star Publishing Co.,* 126 A.2d 238, 242 (Del. 1956); *Romani,* 513 A.2d at 440.

The trial justice, we believe, erroneously concluded that because Stog was aware of the "omnipresence of DEM looming over every aspect of the agreement" that Stog accepted the risk of DEM's refusal to approve its system. Stog certainly never assumed that Bradford would be permitted to prevent and frustrate DEM's opportunity to approve its system and then, without permitted reason, terminate the contract and abort Stog's right to be paid for the Aqualife wastewater treatment system that Stog had designed and completed for Bradford. The trial justice simply overlooked Bradford's neglect and the unwarranted breach of its obligations to both DEM and Stog, pursuant to the April 15, 1993 Amended and Restated Purchase Agreement, when granting absolution to Bradford for its transgressions, and for erroneously considering Bradford to be "blameless." The trial justice's further determination that Bradford should also be relieved of its obligation to Stog because of "impossibility of performance" is likewise fatally flawed. There is no legal precedent that permits Bradford to create the impossibility that prevented its performance and to then shield itself from its contractual obligations to Stog by hiding behind that self created "impossibility" defense.

■ Likewise, Bradford's feeble contention advanced at the arbitration hearings that the cost of the removal of the sludge and for its transportation to dumping sites out of state had become more costly than anticipated, and thus justified its discontinuance of its effort to continue to remove the sludge, is of no avail to Bradford. Economic conditions such as presented in this case scenario are not a viable impracticability defense to Stog's breach of contract claim. *Iannuccillo v. Material Sand and Stone Corp.,* 713 A.2d 1234, 1239 (R.I. 1998), *Grady v. Grady,* 504 A.2d 444, 447 (R.I.1986); Restatement (Second) *Contracts* § 261, cmt. *b.* Simply because Bradford believed that it had made a bargain with DEM that did not turn out to be as advantageous as it had anticipated was not reason to permit Bradford to pack up its bundle of obligations due DEM, and to walk away from its contract with Stog.

We deem unnecessary any consideration and discussion of the remaining appellate issues advanced by both parties in view of our final and dispositive conclusion that the trial justice erred in failing to confirm the arbitrator's decision. Any response to those remaining issues we consider to have been subsumed in our reasoning for concluding error on the part of the trial justice in failing to confirm that award.

For the reasons herein above set out, we conclude that the trial justice erred in vacating the arbitrator's award and in entering judgment in favor of Bradford on its motion to vacate. We also conclude that he erred in denying Stog's motion to con-

firm the arbitrator's award and in entering the judgment in favor of Bradford. We accordingly sustain Stog's appeal and deny Bradford's appeal. The papers in this case are remanded to the Superior Court with directions to enter judgment in favor of Stog on its motion to confirm the arbitration award, and to enter judgment in favor of Stog, on Bradford's motion to vacate the arbitration award.