"As the money poured in, some stuck to Glantz' fingers. Given hisposition at the mayor's right hand, people were eager to be his friend.They would stop by, shake his hand, and palm him some cash. They wouldbuy him dinner, send him flowers, drop off Christmas presents or abottle of liquor. `We want you to have this,' they would say.
 He also became involved in his own scam, with Tony Bucci, to extortkickbacks for the purchase of city garbage trucks in the spring of 1979.The man paying the kickbacks was Joe Doorley's old pal North Providencecar dealer Jimmy Notorantonio. But Jimmy Noto had bigger plans. In oneof the wilder schemes of Cianci's first administration, Bucci washelping Notorantonio line up financing to build a sewage-sludgeincinerator on the Providence waterfront-to turn trash into cash. Cianciwas under pressure to address pollution problems at the aging Providencesewage plant. Greasy balls of sewage were washing up on the beaches downNarragansett Bay: sixty-five million gallons of raw sewage a day gushedinto the bay. The federal Environmental Protection Agency wasthreatening massive fines. Meanwhile, the process of repairing the 1899sewage plant was rife with corruption, from the kickbacks Glantz allegedhad been paid for the contracts to no-show workers to the theft ofequipment-everything from work gloves to sixty-pound cast-iron-and-steelvalves. When Providence police investigating the thefts asked theplant's forty-two workers to take lie-detector tests, all forty-tworefused, on the advice of counsel.
 Jimmy Noto's scheme to help solve Cianci's sewage woes was elegant. Ina deal orchestrated by Glantz, the city would pay Notorantonio to takethe sludge off its hands. Then Notorantonio, backed by amultimillion-dollar federal loan, would build an incinerator withstate-of-the-art German technology and transform the sludge intoflammable bricks that could be sold for fuel. His company was namedInge-for `I Never Get Enough.' But the venture eventually collapsed in atangle of lawsuits, fraud allegations, and criminal investigations.Someone even tried to blow up the unfinished incinerator, which neveropened." Mike Stanton, The Prince of Providence, pp. 144-45. (RandomHouse 2003)
Hopefully, the Court's decision today will put an end to this sordid chapter in Providence's history.
 DECISION
Plaintiff, Inge Company, Inc. (Inge) brings this declaratory judgment action against the City of Providence (the City) alleging that the City breached a contract with it to provide sludge from the City's sewer treatment plant. Jurisdiction is in this Court pursuant to G.L. 1956 § 9-30-1. Since the facts in this case were cogently recited by Ms. Justice Grande in her 1982 decision (C.A. No. 82-373) denying Inge's request for injunctive relief to prohibit the City from transferring its sewer treatment plant to the Narragansett Bay Commission (NBC), there is no purpose in reciting them in their entirety. This parallel action seeks to declare that a contract was created and that the City's breach resulted in damages to Inge. This Court has agreed to bifurcate the trial so that the issue of liability for a breach of contract will first be determined, followed by a trial as to damages, if necessary.
The Court summarizes Justice Grande's factual recital by noting that in 1979 the State of Rhode Island recognized the need to upgrade the City's municipal sewer treatment plant, in order to eliminate pollution of Narragansett Bay. On May 16, 1980, the General Assembly enacted legislation[1] creating a state commission known as the Narragansett Bay Commission (NBC) which would take control of the City's sewer treatment plant. The legislature also authorized the issuance of general obligation bonds so that the NBC could acquire the plant. That funding required state-wide voter approval in the November 1980 election.[2]
Less than a month later, on June 6, 1980, the City executed documents with Inge, granting Inge all of its sewer sludge with the latter constructing the necessary treatment facilities for its disposal. Starting in September of that year, Inge began receiving the necessary approval from various agencies, including the
Rhode Island Industrial Facilities Corporation, to fund construction. In November 1980, the voters approved the bond referendum allowing the NBC to acquire the City's treatment plant. Inge completed construction of its facility in September 1981, with treatment, as per the agreement, of the City's solid waste and sewerage sludge to begin on October 16, 1981.
On December 16, 1981, the NBC entered into an acquisition agreement with the City whereby the NBC would acquire the City's treatment plant, related facilities and properties, with a closing date of February 26, 1982, and an extension date of April 1, 1982. The City and NBC, consistent with the NBC's recommendation, agreed that the NBC would not assume any obligations relative to the Inge-City agreement of June 6, 1980.
In January 1982, Inge filed an action in this Court seeking to enjoin the transfer of the treatment plant and related facilities to the NBC. Relief was ultimately denied by Justice Grande and the transfer took place. Inge then brought this action seeking a declaration that a contract existed between it and the City and damages for its breach by the City.[3]
 Standard of Review
As in any civil action, the burden in this matter is on Inge to satisfy this Court by a preponderance of the evidence as to its claims. The Court has had the benefit of the arguments of counsel, the submission of various exhibits, an agreed statement of facts, and post-trial memoranda of law to assist it.
 Arguments Made
Inge argues that a valid contract was created by the June 6, 1980 document signed by the parties. It contends that the City's position that impossibility prevented its formation is without merit since the City, although aware of the NBC legislation, nevertheless went ahead with the June 1980 document. It asserts the City, in the acquisition agreement with the NBC, still could have negotiated a provision allowing the sludge to go to Inge in accordance with the June 1980 understanding. It is Inge's belief that the City is partially responsible for the impossibility it now asserts, and facts rendering the performance of a promise impossible must be facts that the promissor-City had no reason to anticipate and for the occurrence of which the City was not in contributing fault. Inge goes on to point out that the City knew of the impending take over by the NBC; and since there was no prohibition in the enabling legislation, it could and should have negotiated with the NBC to meet the requirements of the Inge agreement so that sludge could still have been supplied to it.
The City argues that the May 1980 legislation creating the NBC usurped jurisdiction over the treatment plant from the City and, as such, any agreement by the City in contravention of an applicable state statute is illegal, with no contractual rights created or enforceable. The City contends that where impossibility of performance is known to both parties at the time of making the agreement, as here, one of the essentials of a valid contract — legal consideration — is lacking. Additionally, the City asserts that even if impossibility were not a defense available to it, Inge never met the conditions precedent to the performance of the agreement in that Inge never gave proper and lawful notice that it had obtained all necessary federal, state and local licenses and permits for the operation of its treatment facility.
 Analysis
Critical to this Court in determining the validity of the City's defense of impossibility is the legislation creating the NBC. After making certain findings in G.L. 1956 § 46-25-2 that there existed in the Providence metropolitan area a severe water quality problem from the discharge of pollutants into Narragansett Bay, the Legislature went on in § 46-25-10 to direct that the NBC "shall acquire the City of Providence Fields Point sewerage treatment plant, as well as interceptors, combined sewer overflow facilities, force mains and appurtenant facilities, all the land property, easements and other interests in property from municipalities within the district as may be necessary or desirable in its discretion to carry out the duties under this chapter." (Emphasis added.) To accomplish this goal, the NBC was given the power "to take by eminent domain or acquire by purchase or otherwise, such land . . . and other property or interest in the property, public or private, as it may determine necessary or desirable for the purposes of this chapter." The Court views this language as mandating the NBC to take over the Providence sewer treatment plant, and then gives the NBC full discretion as to how to accomplish it, including taking by eminent domain. It left nothing to the subsumed entity but the hope of being treated fairly by the NBC. As such, this Court sees nothing in the legislation allowing the City to negotiate with the NBC as to how the sludge would be disposed. So that when Eric R. Jankel, Executive Director of the NBC, recommended against the Commission take over of the Inge agreement, there was nothing the City could do. (Ex. 3).
Further, there can be no question that the parties had to have been aware of the legislation's existence prior to June 6, 1980. TheProvidence Journal, the primary source of state and local news, gave extensive coverage in 1979 to legislative studies dealing with sewerage facilities and the resulting pollution discharge problems and their effects on Narragansett Bay, as well as to the legislation creating the NBC. By June 6, 1980, the parties should have known that the City's sovereignty over the treatment plant no longer existed and that any attempt to contract regarding it was now in violation of state law, so that contractual rights could not be created or enforced. State v. R.I.Alliance of Social Service Employees, 747 A2d 465, 469 (R.I. 2000).
The enactment of Title 46, chapter 25, thus made any attempt by the parties to contract regarding the treatment plant and the sludge from it an impossibility. Any attempt to contract regarding it was impossible to perform for lack of consideration.[4] "Where impossibility of performance is, in point of law, known to both parties at the time of making the agreement, there can be no intention of performing it on one side and no expectation of its being performed on the other, and therefore one of the essentials of a valid promise, namely, a legal consideration, is wanting." Guldess v. Newberry Wrecker Service,Inc., 267 S.E.2d 763, 765-766 (GA. App. 1980).
Inge's authority for the proposition that a party cannot assert the defense of impossibility if it has been responsible for causing it is not inconsistent with the precedent cited by the City and relied on by this Court. The distinction is that while impossibility cannot be asserted by a party bringing it about, it can be used, as here, where a party does not cause it and was aware of it prior to acting.
While the Court believes that its ruling on the City's defense of impossibility is dispositive, it nevertheless briefly addresses the City's remaining argument that Inge's failure to provide proof of licenses and permits, as per the agreement, either meant the contract was never fully executed, or that it was breached by Inge.
The agreement states that "the effective date of the obligations of the parties will be the tenth (10th) business day following the giving of written notice to the City by Inge that Inge has obtained all necessary federal, state and local licenses and permits for the operation of a treatment plant to carry out its obligations hereunder."
Jerome I. Baron, Finance Director for the City at the time, made affidavit in February 1982 that Inge had not given such notice. As the City points out in its post-trial memorandum, "It is both elementary as well as fundamental law that where parties contract and make performance conditional upon the happening of an occurrence of a particular matter, the contract imposes upon the party required to bring about the happening of that occurrence an implied promise to use good faith, diligence and best efforts to bring about this happening." BradfordDyeing Association, Inc. v. J. Stog Tech GMBH, 765 A2d 1237 (R.I. 2001). That Inge was required to deliver the various permits was not insignificant. They were the equivalent of a property owner giving clear title to his land. Without them the City could not be expected to perform; or alternatively, Inge's non-performance, as the City points out, would constitute a material breach of the agreement.[5]
 Findings of Fact
Having invited the parties to submit an agreed statement of facts, the Court will adopt many that they have submitted:
 1. In August 1979, Governor J. Joseph Garrahy created a Sewage Facilities Task Force in response to recognized public need to correct the City of Providence sewer treatment facilities which were severely polluting upper Narragansett Bay.
 2. The work and recommendation of the Task Force and its report were widely reported in The Providence Journal.
 3. Approved on May 16, 1980, the Act amended Title 46 of the General Laws relating to "Water and Navigation" by adding Chapter 25.
 4. One provision of the Act, R.I. Gen. Laws § 46-25-10 charged the Commission as follows:
 The Commission shall acquire the City of Providence Fields Point sewage treatment plant, as well as interceptors, combined sewer overflow facilities, force mains and appurtenant facilities and the land, property, easements, and other interests in property from municipalities within the district as may be necessary or desirable in its discretion to carry out the duties under this chapter.
 5. The act provided for a statewide referendum to be held at the general election on November 4, 1980 to determine approval or rejection of the bond issue.
 6. The Act provided for the conditional termination of the Bay Commission if the referendum was rejected by the voters.
 7. On June 6, 1980, the City of Providence and Inge Company, Inc. entered into an Agreement ("Inge-City Agreement"), under which the City was obligated to provide and make available to Inge all municipal solid waste collected by or on behalf of the City and all sewer sludge produced by the City's Fields Point Sewage Treatment Plant.
 8. Inge applied for financing to build a solid waste and sewer sludge processing facility ("Inge Facility").
 9. Inge applied to the Rhode Island Industrial Facilities Corporation ("RIIFC") for financing to construct the Inge Facility.
 10. Inge also entered into a Loan Agreement and Mortgage with RIIFC, which obligated Inge to make monthly payments of $44,537 (principle and interest) on the bonds, which payments enabled RIIFC to make payments under the bonds as they became due.
 11. Inge completed construction in September 1981.
 12. The effective date for the parties to commence performance under the Agreement was October 16, 1981.
 13. At the general election on November 4, 1980, voters approved the statewide referendum for the Bay Commission's continued existence and bond issue.
 14. On December 16, 1981, the Bay Commission entered into an Acquisition Agreement with the City pursuant to which the Commission would acquire the City's Treatment Plant and related facilities and properties.
 15. The Acquisition Agreement established a closing date for the transfer of February 26, 1982, which the Bay Commission, at its option, could extend, but to a date no later than April 1, 1982.
 16.Consistent with the position taken by the Bay Commission during negotiations, Section 7.1 of the Acquisition Agreement provided that the City and the Bay Commission agree that the Bay Commission shall not assume any obligation between the City and Inge, making specific reference to the Inge-City Agreement dated June 6, 1980.
 17.After entering into the Acquisition Agreement, the City no longer supplied sludge to or paid Inge in accordance with the Inge-City Agreement.
 18. Inge defaulted on repayment of its loans from RIIFC.
 19. In January 1982, Inge filed an action in the Superior Court seeking to enjoin the transfer of the Fields Point Treatment Plant and related facilities to the Bay Commission.
 20. For reasons set forth in the decision of the Court in Inge Co. v. City of Providence, C. A. No. 82-373, the Court (Grande, J.,) denied Inge's request to enjoin the transfer.
 21. Following its unsuccessful attempt to enjoin the transfer of the Field's Point Treatment Plant and related facilities to the Bay Commission, Inge brought the within action against the City in March 1982, seeking declaratory judgment, an accounting, equitable relief or damages for breach of contract.
 22. The City transferred its sewer system, including the City's Fields Point Sewage Treatment Plant, to NBC under the Acquisition Agreement, which also provided that NBC would not assume any obligation between the City and Inge.
 Conclusions of Law
1. Plaintiff, Inge, has failed to prove its claim for relief, including the declaration that a contract existed between Inge and the City, by a preponderance of the evidence.
2. The City's defense of impossibility of performance prevented any contract being created between the parties.
3. Because of the acquisition agreement with the NBC, the City had no authority to do anything regarding the disposal of sludge from the treatment plant.
4. Any attempt by the City and Inge to contract after the NBC was created was in violation of state law, so that contractual rights could not be created or enforced.
5. Where impossibility of performance is known to both parties at the time of making, one of the essentials of a valid promise, namely consideration is wanting.
6. Where parties make performance conditional upon the performance of certain conditions, the failure of one party to meet these conditions, either excuses the other party of performing or it represents a material breach of the contract.
 Conclusion
Accordingly, the Court finds that Inge has failed to prove, by a preponderance of the evidence, that a contract with the City was created. Therefore, its complaint is dismissed and judgment shall enter for the City. Counsel shall submit an order consistent with this decision.
[1] Title 46, chapter 25 titled "The Narragansett Bay Water Quality Management District Commission Act."
[2] Although not raised by the parties, the Court notes that any argument suggesting the legislation enacted in May 1980 was conditional upon voter approval in November 1980, and not in effect on June 6, 1980, is clearly dispelled by the language of § 46-25-28: "If the people shall reject the proposition submitted to referendum . . . the existence of the commission shall terminate on June 30, 1981, unless its existence is extended by the General Assembly. . . ."
[3] Why the case has remained inactive for so long is unknown to this Court.
[4] The NBC's supremacy over local authority is further expressed in § 46-25-68: "Insofar as the provisions of this chapter are inconsistent with the provisions of any other law or ordinance, general, special, or local, the provisions of this chapter shall be controlling."
[5] While the parties stipulated to the facts, it would have been interesting to hear from Inge's owner, James A. Notarantonio, as he tried to show that Inge had met its burden with regard to the licenses having been provided, as well as to the contract itself. This Court could give little credence to any testimony he might have given regarding Inge's dealings considering his, as well as Inge's convictions for making false statements to some of the very federal agencies he was utilizing in trying to bring this contract about.